We will move to the last case on the calendar, which is United States v. Jeremiah Slayden and Andrew Mize. Are you all also going to divide it 10 and 10? Actually, Judge, I'm appearing on behalf of Mr. Jeremiah Slayden, and I was going to do 12 minutes. That's fine. Mr. Mize has eight minutes. Okay, then let's put 12. Yes, let's put 12 on the clock. And I'd like to reserve one minute, and given the time – good morning, Judge. May it please the Court, I'm Steve Sherrick. Hold on one second. Now we're ready. Now I can start. Good morning. I'm Steve Sherrick. I'm appearing on behalf of Jeremiah Slayden. What I would like to do with the time that I have is focus on argument A, which is the actions of the Border Patrol that we asked for discovery in this case. So what occurred in this case is this was a Border Patrol stop. This was a general law enforcement stop. There's no question about that. The magistrate judge, in hearing the evidence, said he agreed 100% that this had nothing to do with immigration or citizenship questioning. The investigation was initiated by Border Patrol Agent Hughes when he was doing his surveillance. Border Patrol recruited Ranger Rank to follow the vehicle. Can I ask you just one clarifying question before you get too deep into that? Is it your – let's say that we were to conclude that before your client ever got to the border, the checkpoint where he was stopped, that officers collectively did have reasonable suspicion to make the stop, is it your position that you still needed discovery into what exactly was going on with the checkpoint, or at that point does it become irrelevant because they would have had a basis for stopping him just out on the open road anyway? So that actually expands it and hits into the issue as I raised it, which it's not just the checkpoints. It's how Border Patrol is functioning generally in their enforcement activities in the Tucson sector. And so if we look at that, what Border Patrol is permitted to do, and this goes back to Martina Suerte, is they can only stop vehicles if there's reasonable suspicion to believe that the vehicle is transporting unlawful immigrants or there's probable cause to believe that there are unlawful immigrants concealed within the vehicle. They can search at a checkpoint if there's probable cause to believe there's narcotics in the vehicle. We don't have that here. What we have is reasonable suspicion at the time they reach the checkpoint, and the checkpoint being used to investigate general law enforcement. But hold on. I'm just trying to understand your position. The officers who were observing what was going on, I can't remember what. They weren't all Border Patrol people, were they? There was one officer who was not Border Patrol, and that was a National Park Service officer, Rink, who followed the vehicle from when it left this RV park up to the checkpoint and was relaying information to Border Patrol at the checkpoint, saying, I'm behind the vehicle, and relaying some additional information that he was gathering that added to the calculus of reasonable suspicion. He was there at the request of Border Patrol. And where that dovetails with what I tried to present to the court is that Border Patrol in Tucson for at least the last seven years or more has engaged other law enforcement agencies. I'm not saying that National Park Service was paid or that they were part of Operation Stone Garden, but if we look at the overall picture, it shows that there is a Border Patrol plan of operation to recruit other law enforcement agencies. I'm having trouble sort of connecting the dots of your argument. If there was reasonable suspicion before the vehicle got to the checkpoint, I don't understand what the basis would be, regardless of what the purpose of the checkpoint was, to suppress any evidence if there's reasonable suspicion. So I don't understand why the presence of reasonable suspicion doesn't moot your argument that discovery would have helped you advance your motion to suppress. If there's reasonable suspicion, then I think the fact that they stopped it at the checkpoint, as opposed to a less safe place, I don't see how that matters. So reasonable suspicion develops. Let's say it develops before they get to the checkpoint. Let's say there's not a checkpoint there. Could Border Patrol have stopped the vehicle if the checkpoint wasn't there? No, because they can't stop a vehicle for reasonable suspicion for general law enforcement purposes. It has to be for an immigration or citizenship purpose. So they couldn't have stopped it but for the checkpoint. Are you saying that's true even if, let's just say state officers were the ones that made all the observations and developed reasonable suspicion? If they radioed ahead to some Border Patrol person who was just hanging out and said, hey, can you help us out and stop this car, you're saying they couldn't? Well, it's very interesting you ask that question because if we go backwards and we look at Soylent because in Soylent the majority said, you know, we don't have to really worry in this case about whether or not Border Patrol has bad motives. And then Judge Kosinski in the dissent basically laid out what he thought was a danger of these checkpoints. And one of the things that he said is that you could have a situation where the DEA works in cooperation with Border Patrol, they gather information to establish reasonable suspicion and then radio on ahead to Border Patrol in order to get Border Patrol to stop a vehicle or to investigate a suspicion that DEA has and that it's like the thin edge of the wedge. We can recruit other agencies to then provide us with information so that we can exercise a function that we're not entitled to do, which is general law enforcement. And in the last case this court saw was Soto Zuniga. And the interesting thing about that case is in that case there actually was a hearing. Now, what happened? I will agree that reasonable suspicion and later probable cause developed at the checkpoint. There had been a hearing and the government put on evidence where an agent testified that 90 percent of the interdictions at the checkpoint were immigration related. And in spite of that, this court said we're going to remand this for discovery because the defense hasn't been given an opportunity to confront cross-examination the testimony of this officer because they don't know what information is out there. On remand, the case is dismissed. So that doesn't happen. Now, what we've been able to discover is how Border Patrol initiated this Operation Stone Garden program where basically they have state and local law enforcement officers working for them on an ongoing basis for years to do things that Border Patrol agents are prohibited from doing. If we just look at the number of stops in government's Exhibit 29. Counsel, I'm sorry to interrupt. The government argues, I think it's in footnote 8 at page 24 of their brief, that to the extent the defendant is claiming that Border Patrol agents did not have statutory authority to stop the truck for drug smuggling, the defendant did not make that claim in the district court. Well, the claim that we made in district court is that the overall operation of this program was inconsistent with the Border Patrol's function. And we did raise the claim repeatedly that not just were the checkpoints operating illegally, but so were these roving patrols that were being operated by state and local law enforcement. Did you specifically make the argument in the district court that the Border Patrol agents didn't have statutory authority to stop the truck for drug smuggling? If I recollect, where they would have authority to stop the truck for drug smuggling would be if they had probable cause. What the government also says in that footnote is, citing the United States v. Juvenile Female case, that the Border Patrol agents have authority under 19 U.S.C. 482 to stop and examine a car where they suspect there's merchandise introduced into the United States in any manner contrary to law. What's your response to that argument as to the point that they had no authority? Well, as to Mr. Slayton and Mr. Mize, they had no information to establish that they had, in fact, imported anything into the United States. They may have had reasonable suspicion to believe that they picked it up within the United States and transported it from there. Well, it says that there is merchandise introduced into the United States in any manner contrary to law. I mean, if this stuff came across in the RV park, it was certainly introduced into the United States in a manner contrary to law, and then your client was carrying it. Why isn't that within 19 U.S.C. 482? So there's a – what I would say is that then that would allow Border Patrol to stop a vehicle at any time, anywhere, if there was suspicion that there was, let's say, cocaine in the vehicle, because the overwhelming inference from that would be that it had been brought into the United States illegally from Ecuador, Colombia, or somewhere else outside the United States. And that would then say, in general, that Border Patrol can operate in a general law enforcement capacity at any time where there's reasonable suspicion to believe that a vehicle is carrying narcotic contraband. I see that I've got a minute and 30 seconds. Yeah. Why don't you save the rest of your time for rebuttal, and we'll hear from counsel for your co-defendant. Good morning, Your Honors. I would actually like to reserve one minute for rebuttal. I'm Douglas Tyler Francis. I represent Mr. Mize. Basically, what I'm here to do today is talk about being a trial attorney and having the evidence against you come from circumstantial and other experts and not actual hard physical evidence that you can challenge. This case, as far as Mr. Mize was concerned, had a number of places where the evidence was not preserved, was not protected, was not gathered, even though the Border Patrol agents had resources, had the capability, and had the wherewithal, they just didn't have the incentive to gather any information. Specifically, Agent Hughes had what's called an MCS truck, which is a $2 million truck that they use to watch the border fence. He videotaped people coming across the border from Mexico into the U.S., allegedly into the Gringo Pass RV park, but then didn't preserve it. His supervisor told him, don't do it. It will take too long to go back and look at it. So we have a video that was presented at court that shows approximately eight people coming in with backpacks and then nothing. Then, based on that information, Agent Hughes sends agents apparently to the Gringo Pass RV park to look around. And at trial, we found out that those agents, actually, excuse me, at a hearing prior to trial, we found out that those agents had found footprints and bundles somewhere in the park but hadn't preserved them. There was rain and it was an area where you could actually preserve footprints and information, but they didn't preserve them. Well, they didn't take them. Excuse me, you're right. It wasn't that the government had taken pictures of the footprints or taken the bundles and then lost them or threw them away. They chose not to gather them. They chose not to gather them, Your Honor. You're absolutely correct. And why would the government have known that that might help your defense? Because Mr. Mize had spoken to agents contemporaneously at the border checkpoint, explaining that he had been at the Gringo Pass RV park, that he had attempted to, that he had attempted to, actually, he was actually listening to Mr. Slayton, but Mr. Slayton had attempted to locate a person in a trailer to do electrical work. And Mr. Mize said he was along with Mr. Slayton to do electrical work. And if he, and that became basically the whole premise of the case because if Mr. Mize. I'm not following how preservation of this evidence you've just referenced. The video, I guess, of the people going back to Mexico and these footprints, how it would have helped support your client's defense in the regard you just mentioned. Well, one, it would have shown whether or not they had any gear or equipment or had left something in the RV park. Two, it would have, one of the issues at the trial was the fact was did Mr. Mize, would he have been able to see the folks at the RV park or not? Meaning, was his defense credible? Was he actually blocked by a mobile home to where he couldn't see the truck being allegedly loaded or not? And if we had known where the bundles and footprints were, then we would have information to gather about where the trailer was and see if it actually bolstered or undercut Mr. Mize's defense. And that was the purpose of that. The secondary purpose is one of the issues that we're having right now with this case, and I'm hoping the court will take a look at, is that the government made that decision. They had agents there looking at the footprints, looking at the bags, knowing this case was happening, and they didn't even preserve the names of the agents. We don't have the names of the agents, let alone any evidence. So trying to represent a client who's proclaimed his innocence and wants to go to trial, we don't have even anything to look to as credibility. Then, again, we get to the checkpoint itself. Mr. Mize's credibility was at issue the entire time because he testified in this case. At the checkpoint, with all the cameras and all the gear and everything else around, they could have taken photographs. We just heard in the last case there was a prison photograph, video of what happened. But here at a checkpoint where they're interdicting many, many citizens a day, we are forced to rely on the agent saying my client was nervous and appeared to be staring straight ahead as opposed to my client saying I handed him my license and I said I was a U.S. citizen. Now that is a very small issue, I will give you that, but it is an issue that goes to credibility. And ultimately this case comes down to circumstantial evidence by Agent Garbo testifying how a drug smuggler would operate versus my client attempting to testify for the first time about what actually happened, what happened that day. The coup de grace, and frankly the most offensive part of this case, was the introduction of the vest at the end of the trial, let alone all the other information about the evidence that wasn't preserved. At the end of the trial there was a vest in the truck, it was Exhibit 41, that was never preserved. Instead there was some testimony by the various agents of it looked like a utility vest. One agent said that Mr. Mize was wearing that when he came up to the checkpoint. One agent, excuse me, Ranger Rink said he didn't recognize it, and the only photo taken by Ranger Rink, not Border Patrol, showed Mr. Mize wearing a T-shirt and jeans and no vest. And yet the government introduced at the end of trial the vest that they had a guy from Rural Electric who actually owned the company come down, bring a vest, it was Exhibit 65, and then they introduced that to the jury that had Rural Electric on it. They didn't argue it in closing, I'll give them that, but just the presence of that vest with that Rural Electric logo was the only thing that connected Mr. Mize to the fake Rural Electric. I thought the whole point of the real vest being introduced was so that the jury, sorry, could compare it to the vest that was in the truck. I seem to recall there's a photograph of it bundled up on the dashboard to say that, no, no, no, whatever those folks had, it wasn't one of our vests. I have one minute, Your Honor, but I presume that that was their purpose, but they presented it as a Rural Electric vest to the jury with the implication that this vest matches everything else. No, no, no. Sorry. I was just seconding what Judge Watford just said. It seemed to me the obvious purpose was so that the jury could infer that the vest that was photographed was a phony vest, one more indication of their criminal, of your client's criminal behavior. Maybe, Your Honor, but I don't see that. I don't see why they would not have brought in the real vest and then done a comparison because the implication from the witness statements, if I may finish, was that no one saw the logos and decals on the vest wadded up in the truck. So it could have looked like another fake thing there, and it wasn't, but they didn't bring in the vest. Did you object on grounds of relevance? I did. And what did the government say was the purpose? The government, I think, if I remember correctly, the government didn't respond as to a purpose. The judge overruled my objection. And I could check that, Your Honor, but I don't have it, frankly, in front of me. Okay. We'll give you some time for rebuttal nonetheless. Let's hear from the government. Thank you. Good morning, and may it please the Court. Jay Koperskowski appearing on behalf of the United States. If I may, I'd like to first address the arguments made by Appellant Sladen. The key question here is whether the stop and the subsequent search complied with the Fourth Amendment. And the district court properly concluded that it did because the stop was supported by reasonable suspicion, which ripened into probable cause prior to that search. Despite the fact that this stop occurred at a United States Border Patrol checkpoint, this is not a checkpoint case. This was a stop that was based on reasonable suspicion, and law enforcement had that reasonable suspicion prior to and entirely independent of. And what is it that you say then led to its ripening into probable cause? Well, the district court determined that it likely ripened into probable cause once the agent saw that void in the truck, which was covered and was not consistent with what a proper utility truck would look like, and it looked like contraband would likely be hidden under there. Because the reason I raise that is so you're not necessarily relying on the alert by the dog. That's correct, Your Honor. Okay. And the district court also found that the alert by the dog was unnecessary because agents had probable cause prior to the dog being called. But the district court, the magistrate judge and the district court, or at least the magistrate judge and the district court adopted it, found that the dog did hit, did alert, yes? Yes, Your Honor. So both the magistrate court and the district court found that the dog did alert sufficient for finding a probable cause. However, they both also stated that probable cause existed prior to that canine being called. I'm sorry. No. Because the dog did not sit down, which the dog normally does on an alert, yes? That's correct. So in training, in a controlled training environment, the dog would ordinarily sit upon an alert, sit or lie down depending on the dog. This dog was trained to sit, to indicate there's a difference between an alert and an indication. But as this court has previously stated, in the Thomas opinion, an alert prior to an indication is sufficient for finding a probable cause. And the expert and the handler both testified the dog alerted. That's correct, Your Honor. Yeah, I've looked at the video. I find it extremely difficult to see the basis on which they could have opined that the dog alerted. But we don't have to reach that if there's already probable cause. That is correct, Your Honor. So the government has argued both below and here that probable cause existed at the moment that the truck was seen leaving the RV park. But certainly once the agents were able to see that void in the truck that they determined was likely to hold contraband. So the determination of whether the canine alerted is unnecessary to a finding of probable cause. However, we still do submit that the alert was sufficient. And when you watch the video, although it is admittedly a very quick alert that you see there, the agent testified that these alerts are unique to the individual canine, and he's trained to view what that canine does when it alerts. And he was able to testify that he saw that in this case. Does the alert occur on the part of the video when we're able to see the dog? Yes, Your Honor. Okay. I believe he testified that when you see the dog turn behind the truck and move back around. I have to concur in my colleague's evaluation of the video. I read the testimony first and then watched the video and I thought, oh, surely I've missed something. Let's go back because I couldn't figure out what in the world they were relying upon. Maybe just go back for one second. Why do we not need to rely on the dog alert? Because I thought we did. What's this thing about the void in the truck? I didn't focus on that closely enough, I guess. Well, we have all of the facts leading up to prior to the checkpoint and then once they conducted further investigation at the checkpoint. So starting all the way down at the border. No, no, no. You don't need to do that. I got all those facts straight. I'm just saying once they get to the checkpoint, you're saying that the fact, if all we thought was they had reasonable suspicion up until then, you're saying that the fact that tips us over into probable cause is the discovery of this void in the truck? Just help me understand the chain of inferences there. Yes, Your Honor. So with that reasonable suspicion that they had at the checkpoint, they garnered additional facts demonstrating that this was very likely a counterfeit truck. And over in secondary, once it was pulled over there, the suspicious answers of both defendants as they were communicating with law enforcement, the story that they were giving of traveling down for this maintenance job in a very rural part of Arizona where they didn't have details of it, only gave a first name of the customer that they were supposedly going to be servicing without a work order, an invoice, a proper authentic work order, an invoice, or any details of the event. In addition to that, they saw in the back of the truck this void that was covered. It was an air compressor that appeared to be in a spot that would not ordinarily be placed there in a proper utility truck. Is this what the magistrate judge was referring to as the inaccessible compartment? Yes, Your Honor. There was a void in the truck that was inaccessible. So if this were a proper utility truck, not a counterfeit truck, it wouldn't have been set up that way, but it appeared to be set up to hide some sort of contraband. But it's not just that. It's also, as you just said, they told the whole series of what any officer would have regarded as blatant lies about what they were doing and what they were up to, and all that occurred even before this, right? That's correct, Your Honor. So they had those lies. They had those statements. They had all the suspicious circumstances all the way from Lukeville to the checkpoint. And in addition to that, then looking at the truck, they saw this void and determined there's very likely contraband in that void. Can you follow up on the dialogue that my colleague Judge Bennett had with your opponent about just the authority of Border Patrol in general to do what it appears that it is doing down here in this border area? Yes, Your Honor. So our answer is two-part. First, we agree and submit, as we did in our brief, that the United States Juvenile Female establishes the fact that Border Patrol is a federal agency. They're able to investigate and arrest for federal offenses when they see one occurring, especially one relating to contraband being brought into the United States, which is what happened here. We had a testimony establishing that there were very likely marijuana bundles being brought across the border at the Gringo Pass RV Park, and then this truck leaves about ten minutes later and is seen traveling up the highway. So Border Patrol is probably carrying out their statutory duties just looking at those facts. But also, counsel's argument is a bit of a red herring here in terms of arguing that Border Patrol is doing something illegal somewhere in southern Arizona, and therefore you should find that they did something wrong in this case, when those allegations have nothing to do with this case, because this case was a stop that was based on reasonable suspicion that ripened in a probable cause, entirely independent of the checkpoint, or the reasonable suspicion was entirely independent of the checkpoint, and was not relying on immigration authority if you look at the facts that caused the facts to surpass the hurdle of reasonable suspicion. But also this Operation Stone Garden, there isn't even an allegation that this case was part of Operation Stone Garden, and the agents who were involved in carrying out this stop and the subsequent search were federal agents. So a grant program regarding local agencies assisting in Border Patrol's mission has nothing to do with this case, and the discovery was properly denied on that basis. To turn to some of the other arguments, since counsel has focused his arguments on the search at the checkpoint, would the judges like to hear arguments regarding the other arguments that Slayton has made, or I can move on to Myza's arguments? I have no other questions. I don't either, so go ahead. So I'd move on then. To address the destruction of the evidence, there was evidence that was not preserved, the video evidence, but even if we apply the harsher-for-the-government standard under Sevilla, there was no bad faith here. And one of the inquiries that the court should look at is whether the prosecutors were involved in this. The trial attorneys were seeking out all of the evidence that they could have. The Border Patrol supervisor made the determination that it wasn't worth the time to go back and view the evidence or view the video to re-record that. And within a matter of 24 hours, that evidence was re-recorded over. This was the video of people leaving. Exactly. And most importantly, that evidence was inculpatory. It fit the facts that fit the government's theory of the case and would have shown what Agent Hughes was able to testify about. You don't know because you haven't seen the video. That's correct. So I don't know how you could say it was inculpatory, something you haven't even seen. That's correct, Your Honor. You can guess. You can hope. But you don't know. Well, we have testimony from a Border Patrol agent stating what it would show. Which may or may not be accurate, and that's why they wanted the video. I mean, I just thought that the reason given that it's going to take too long just struck me as not a very legitimate one here. It would only have been inculpatory if it showed them without the backpacks, right, when they left. That's correct. Without the majority of them without backpacks, but with a number of them carrying what appeared to be the remnants of the bundles, the packaging material, which is what was testified to. Certainly the government does not endorse these actions. However, we focus on, in this case, whether it was prejudice to the defendants. And based on the overwhelming evidence in this case, we argue that there's none here. To argue about the vest issue, we really see no argument here on counsel's part because the vest was properly authenticated, and it was not unduly prejudicial. As the court has noted, the entire basis for showing this was just to further show that there was a counterfeit truck, and they were dressed up to look like employees of a company that they never worked for. So, yes, the court is correct in stating that we were trying to show that the real vest of a real Rural Electric employee did not look like what was shown by the picture. You all didn't hold on to the fake vest? We had the picture of the vest, and that's what we admitted. What happened to the actual thing? I don't believe there's, as far as I know, there's nothing in the record to show what was done with it. Maybe you ought to talk to your folks down there. They don't seem very intent on preserving evidence. Obviously, maybe I grant you with the footprints. I can understand how why would we think that was going to be relevant to the defense. But the vest, I mean, my goodness, it's all crumpled up, and so you can't really see much. It would have been helpful for the jury to have been able to see the whole thing. It may be helpful for you, the government, right? I don't understand why that wasn't preserved. Instead, we have this lousy photo. Well, it's true that it would be helpful for the government. However, the government had no obligation to present every possible piece of evidence that would show that would be sufficient for a conviction here. We had much more than we needed for a conviction in this case. Was there evidence that the actual seized vest had been destroyed or simply that the government chose not to introduce it? I don't recall. I don't believe it's in the record either way, Your Honor. We just have the picture of it crumpled up on the dash there. Did the defense make a discovery request that would have required you to show them the actual vest if you had complied with their request? I don't believe so, Your Honor. There was not a discovery request for that particular vest. The argument was that it was overly prejudicial to show a real, when we weren't arguing that that's what he was wearing. But that misses the point of why the government was presenting it to show that he was dressed up to look like a Rural Electric employee when he never had. But to further show that this is, if there was error here, that it was harmless, we also have the testimony of the owner of Rural Electric who went back through the database and was able to testify that these two appellants never worked for his company, were never employees of Rural Electric. So we certainly had evidence to try to get at what the vest would have shown had we had it. To just briefly address the severance issue, we would first argue that this issue is waived. The appellant's demise did not properly preserve it by continuing to renew his motion for severance. Once evidence regarding severance was presented at trial, which he has an obligation to do. But even if we are to get to the merits of the severance issue, pursuant to the Throckmorton opinion, Mize is unable to show that the defenses were so at odds with each other that he was prejudiced by a joint trial. In fact, their defenses were helpful to one another, seeing that Sladen was arguing he had no idea there was marijuana in the vehicle, 1,500 pounds of marijuana, more than 1,500 pounds of marijuana. And appellant Mize also was arguing that he was merely present in this vehicle. So they were really consistent defenses, and there's no way that they could show that this was prejudicial. Just to briefly address the safety valve argument, the fact of the matter is the defendant, Mize, who testified at trial, did not truthfully provide all the facts that were known to him regarding this offense. In fact, he gave perjurious testimony, and the district court concluded as such, stating that this was actually false testimony, which he called incredible and false testimony that he willfully gave at trial. He gave this story that was just not believable at all, not credible, and so he's certainly not eligible for the benefit of safety valve, giving credit to defendants who come forward and provide all the facts to which they knew. He maintains that he was merely present and didn't know. I think the remaining issues are adequately covered in the briefs, counsel. Thank you, Your Honor. Okay, very good. Let's put two minutes, I guess, for each defendant. Rebuttal. Thanks, Judge. I just wanted to address first the court's question at the beginning about the district court's determination of probable cause based on the canine search, and in her order, which is Doc 268 at ER 19, she specifically says canine and nooks alert behavior established probable cause for the vehicle search. And the court has actually hit on exactly the point. We can all watch the video, and we've all watched the video, and we see the dog showing some interest in sniffing at the corner bumper, sniffing underneath and coming back out, going around the vehicle, getting on top of the vehicle. Yeah, but wasn't there plenty of probable cause independent of that because of the series of extremely improbable, frankly, lies told by the defendants about what they were doing, what they were up to, and then the observation that their vehicle had an inaccessible compartment that would not be part of a normal vehicle? I'll address the first part first. So we have a vehicle that what, you know, Agent Rink said he checked the registration on the vehicle as he was driving up, and it was properly registered to Mr. Sladen. It's a utility truck. The story that was told, and I'm not saying it was true, but the story that was told wasn't so incredibly unbelievable that a recently purchased utility vehicle being used by these individuals to do some electrical work at an RV park isn't something that on its face is incredible and unbelievable. They, your client could not produce a work order for the alleged electrical job at the RV park. When asked to provide a name and phone number for the customer, he only could state a first name. He had an implausible story regarding how he came to be employed. And then there was the large compartment that appeared to be inaccessible. Why is it in common sense to infer from that they're not involved at all in what they say they are? And given the compartment, they're most likely transporting drugs. I would say it's a close question. But if that's all so, it also, and I'm sorry, I'm out of time if I could have, that also dovetails with the argument I made about why not seek a search warrant. Because if there's probable cause established at that point, which was within minutes of this vehicle being detained at the checkpoint, why not apply for a search warrant? Why wait 40 minutes for a dog to come and sniff? That's a separate issue, yes. And the dog sniff is what the district court said ultimately gave them probable cause. And they're being detained, which we called an arrest, for at least those 40 minutes while they're waiting for the dog. If I could just briefly make one point regarding the checkpoint. In both Edmonds and in Martinez-Suerte, what the court said is you need to look at the programmatic purpose of the checkpoint. And that's why we've raised the issue of how Border Patrol is operating generally at the checkpoints and in their enforcement of the law in the Tucson sector. And it's not this individual case, because every case you're ever going to see in this case, in this court, there's going to have been reasonable suspicion of probable cause. Okay. Thank you, counsel. We'll give two minutes for your co-counsel here. Thank you, Your Honors. First, I'd like to point out that the whole reason that we're discussing the alert behavior of the dog is because Mr. Sladen filmed it himself. That information did not come from the government. It was not preserved by the government. It came from the defendant, Sladen. Second, I noticed the court has started referring to the lives of both defendants. It's still our position that the information that Mr. Mize presented to the Border Patrol agent was limited to talking about him being at day labor, being hired by Mr. Sladen to go on a job with him, and was consistent with what he was wearing and what he was capable of doing, and that's why the vest is so important. Because that, like in U.S. v. Mejia, it's a piece of information that's not relevant to the case of the government, but it is incredibly prejudicial when it's coupled with everything else. As far as discovery requests, I don't believe there was a discovery request specific to the vest, but I did inspect the vest in the vehicle, and it was in at least the first inspection and was available to the government. More importantly, they never made a showing about why they didn't present the actual vest. Again, it's like Agent Garbo's testimony. But it sounds like you could have. You saw the actual vest? Well, I saw it wadded in the truck. Frankly, I didn't think it was important. I mean, I didn't realize it was important until the rural electric vest showed up and got presented to the jury. But if you felt that the original vest was now important, you could have asked for a brief continuance. It would have taken very little time to get the vest, and you could have presented it on rebuttal or cross-examination or whatever. Yes, Your Honor. However, one of my clients, the only photo of my client was taken, did not have the vest on him. One of the other agents testified, the agent, Ranger Rink, testified that the vest was not there. He didn't see it. And it was only one agent that put him there without any other evidence. So, frankly, that was a tough decision about whether or not to bring that in or not because there was no other corroborating evidence about that. May I have just a second to address safety valve? Very briefly. Go ahead. Okay. Basically, my client has proclaimed his innocence throughout. He testified extensively in front of the court, and he has this appeal. He had no prior record, and it seems to me that there was nothing else he could proffer at that point that would have satisfied the government because they did not believe him. They never believed him. Thank you. Okay. Thank you very much for the arguments in this case. The case just argued is submitted.
judges: Watford, Rakoff, Bennett